

U.S. DISTRICT COURT
EASTERN DISTRICT-WI
FILED

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

2014 MAY 20  A 9 46

JON A. SANFILIPPO
CLERK

UNITED STATES OF AMERICA,

Plaintiff,

v.

Case No. 13-CR-193

PAUL HEINIGER,

Defendant.

## PLEA AGREEMENT

1.     The United States of America, by its attorneys, James L. Santelle, United States Attorney for the Eastern District of Wisconsin, and Bridget J. Domaszek, Assistant United States Attorney, and the defendant, Paul Heiniger, individually and by attorney Michael Hart, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

### CHARGES

2.     The defendant has been charged in two counts of a sixteen-count indictment, which alleges violations of Title 21, United States Code, Sections 841(a)(1), (b)(1)(B), 843, and 846.

3.     The defendant has read and fully understands the charges contained in the indictment. He fully understands the nature and elements of the crimes with which

he has been charged, and the charges and the terms and conditions of the plea agreement have been fully explained to him by his attorney.

4.    The defendant voluntarily agrees to plead guilty to the following count set forth in full as follows:

## COUNT ONE

### THE GRAND JURY CHARGES:

1.    Beginning in approximately 2012 and continuing until October 8, 2013, in the State and Eastern District of Wisconsin, the State and Northern District of California, and elsewhere,

### EDWARD PATTERSON,
### PAUL HEINIGER, and
### KEVIN BREITZMAN

knowingly and intentionally conspired with each other and persons known and unknown to the grand jury to possess with the intent to distribute and distribute controlled substances, in violation of Title 21, United States Code, Section 841(a)(1).

2.    The offense involved 100 kilograms or more of a mixture and substance containing marijuana, a Schedule I controlled substance.

All in violation of Title 21, United States Code, Sections 841(b)(1)(B) and 846, and Title 18, United States Code, Section 2.

5.    The defendant acknowledges, understands, and agrees that he is, in fact, guilty of the offense described in paragraph 4. The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove the facts in Attachment A beyond a reasonable doubt. This information is provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of, or participation in, this offense.

2

## PENALTIES

6.    The parties understand and agree that the offense to which the defendant will enter a plea of guilty carries the following maximum term of imprisonment and fine: count one, 40 years and $5 million.  Count one also carries a mandatory minimum of 5 years of imprisonment, a mandatory special assessment of $100, at least 4 years of supervised release, and a maximum of a lifetime term of supervised release.

## DISMISSAL OF REMAINING COUNTS

7.    The government agrees to move to dismiss count ten of the indictment at the time of sentencing.

## PROOF OF DRUG WEIGHT FOR STATUTORY MAXIMUM PENALTY

8.    The parties understand and agree that for the penalties in 21 U.S.C. § 841(b)(1)(B) to apply, as provided in paragraph 4 above, the government must prove beyond a reasonable doubt that the offense to which the defendant is pleading guilty involved at least 100 kilograms or more of a mixture and substance containing marijuana, a Schedule I controlled substance. The defendant agrees that the government possesses sufficient, admissible evidence to meet this burden.

## ELEMENTS

9.    The parties understand and agree that in order to sustain the charge of conspiracy to possess with the intent to distribute and distribute marijuana as set forth in count one, the government must prove each of the following propositions beyond a reasonable doubt:

3

(1)    the conspiracy charged in count one existed; and

(2)    the defendant knowingly and intentionally became a member of the conspiracy with the intent to further the conspiracy.

## SENTENCING PROVISIONS

10.    The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

11.    The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

12.    The parties acknowledge and agree that they have discussed all of the sentencing guidelines provisions which they believe to be applicable to the offense set forth in paragraph 4. The defendant acknowledges and agrees that his attorney in turn has discussed the applicable sentencing guidelines provisions with him to the defendant's satisfaction.

13.    The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and

4

agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the defendant's criminal history.

## Sentencing Guidelines Calculations

14.     The parties acknowledge, understand, and agree that the sentencing guidelines calculations included in this agreement represent the positions of the parties on the appropriate sentence range under the sentencing guidelines. The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

## Relevant Conduct

15.     The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offense to which the defendant is pleading guilty.

16.     The parties agree to recommend to the sentencing court that the relevant conduct attributable to the defendant is at least 100 kilograms but less than 400

5

kilograms of a mixture and substance containing marijuana, a Schedule I controlled substance.

## Base Offense Level

17.     The parties agree to recommend to the sentencing court that the applicable base offense level for the offense charged in count one is 26 under Sentencing Guidelines Manual §2D1.1(c)(7).

## Acceptance of Responsibility

18.     The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility. In addition, if the court determines at the time of sentencing that the defendant is entitled to the two-level reduction under § 3E1.1(a), the government agrees to make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b) because the defendant timely notified authorities of his intention to enter a plea of guilty.

## Sentencing Recommendations

19.     Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

6

20.     Both parties reserve the right to make any recommendation regarding any other matters not specifically addressed by this agreement.

21.     The government agrees to recommend a sentence of no greater than 60 months' imprisonment at the time of sentencing.

## Court's Determinations at Sentencing

22.     The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 6 above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

23.     The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

## FINANCIAL MATTERS

24.     The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable in full upon entry of the judgment of conviction. The defendant agrees not to request any delay or stay in

7

payment of any and all financial obligations. If the defendant is incarcerated, the defendant agrees to participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the Court specifically directs participation or imposes a schedule of payments.

25.     The defendant agrees to provide to the Financial Litigation Unit (FLU) of the United States Attorney's Office, upon request of the FLU during any period of probation or supervised release imposed by the court, a complete and sworn financial statement on a form provided by FLU and any documentation required by the form.

### Fine

26.     The parties agree to recommend to the court that a fine should not be imposed.

### Special Assessment

27.     The defendant agrees to pay the special assessment in the amount of $100 prior to or at the time of sentencing.

### Forfeiture

28.     The defendant agrees that all properties listed in the indictment and bill of particulars constitute the proceeds of the offense to which he is pleading guilty, or were used to facilitate such offense. The defendant agrees to the forfeiture of these properties and to the immediate entry of a preliminary order of forfeiture. The defendant agrees that he has an interest in each of the listed properties. The parties agree that the

8

forfeiture of the defendant's properties as described in the indictment and bill of particulars will be determined by the court prior to or at the time of sentencing.

## DEFENDANT'S COOPERATION

29.     The defendant, by entering into this agreement, further agrees to fully and completely cooperate with the government in its investigation of this and related matters, and to testify truthfully and completely before the grand jury and at any subsequent trials or proceedings, if asked to do so. The government agrees to advise the sentencing judge of the nature and extent of the defendant's cooperation. The parties acknowledge, understand and agree that if the defendant provides substantial assistance to the government in the investigation or prosecution of others, the government, in its discretion, may recommend a downward departure from the applicable sentencing guideline range. The defendant acknowledges and understands that the court will make its own determination regarding the appropriateness and extent to which such cooperation should affect the sentence.

## DEFENDANT'S WAIVER OF RIGHTS

30.     In entering this agreement, the defendant acknowledges and understands that in so doing he surrenders any claims he may have raised in any pretrial motion, as well as certain rights which include the following:

> a.     If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

9

b. If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

c. If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

d. At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

e. At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

31. The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorney has explained these rights to him and the consequences of his waiver of these rights. The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant intends to plead guilty.

10

The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

32.     The defendant acknowledges and understands that he will be adjudicated guilty of the offense to which he will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

33.     The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

34.     Based on the government's concessions in this agreement, the defendant knowingly and voluntarily waives his right to appeal his sentence in this case and further waives his right to challenge his conviction or sentence in any post-conviction proceeding, including but not limited to a motion pursuant to 28 U.S.C. § 2255. This waiver does not extend to an appeal or post-conviction motion based on (1) any punishment in excess of the statutory maximum, (2) the sentencing court's reliance on any constitutionally impermissible factor, and (3) ineffective assistance of counsel.

35.     The defendant knowingly and voluntarily waives any claim or objection he may have based on statute of limitations or venue.

## Further Civil or Administrative Action

36.     The defendant acknowledges, understands, and agrees that the defendant has discussed with his attorney and understands that nothing contained in this agreement, including any attachment, is meant to limit the rights and authority of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

## GENERAL MATTERS

37.     The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

38.     The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

39.     The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

40.     The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing,

12

or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing. If the defendant and his attorney have signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that he continues to be subject to the terms of the proffer letter.

## VOLUNTARINESS OF DEFENDANT'S PLEA

41.     The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

13

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: 5-7-14

PAUL HEINIGER
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: May 7, 2014

MICHAEL HART
Attorney for Defendant

For the United States of America:

Date: 5/20/14

JAMES L. SANTELLE
United States Attorney

Date: 5/20/2014

BRIDGET J. DOMASZEK
LAURA S. KWATERSKI
Assistant United States Attorneys

14

## ATTACHMENT A

Had this case proceeded to trial, the United States would have proven the following facts beyond a reasonable doubt. These facts are based upon information provided by confidential informants, the anticipated testimony of numerous cooperating sources and law enforcement agents, electronic surveillance, records obtained via grand jury subpoenas, and physical evidence seized throughout the investigation of the conspiracy. The information is provided for the purpose of setting forth a factual basis for the defendant's guilty plea. It is not a full recitation of the defendant's knowledge of, or participation in, these offenses.

### Overview

From 2012 until October 8, 2013, Edward Patterson and members of his drug trafficking organization (DTO) conspired to obtain and distribute high grade marijuana from their source of supply, Paul Heiniger, who resides in Mendocino County, California. Members of the DTO transported the high grade marijuana via car and mail to the Eastern District of Wisconsin, where it is distributed. Patterson used his three McDonald's restaurants to obtain currency to fund and promote his drug-trafficking, to conceal his drug proceeds, to recruit individuals to traffic marijuana on his behalf, and as locations to conduct drug transactions.

The evidence reflects that as part of the conspiracy and in furtherance thereof, certain conspirators provided large amounts of money to obtain large quantities of marijuana from other conspirators inside and outside of the Eastern District of Wisconsin, including in the Northern District of California and elsewhere. Certain conspirators traveled to the Northern District of California, and elsewhere to obtain large quantities of marijuana, which were brought back to the Eastern District of Wisconsin. The conspiracy also used numerous addresses in the Eastern District of Wisconsin to receive marijuana shipments in the United States mail. Once the marijuana was obtained, it was distributed among members of the conspiracy for wholesale and retail distribution within the Eastern District of Wisconsin. The conspiracy used various residences to store, package, prepare, and distribute the marijuana. Finally, certain members of the conspiracy possessed firearms to protect the drugs and drug proceeds of the conspiracy.

**Edward Patterson** – Cooperator statements, recorded conversations, physical evidence, surveillance, phone records, and USPIS records reveal that Paul Heiniger is Edward Patterson's source of supply of marijuana and serves as a marijuana broker. Patterson recruits McDonald's employees and uses them to travel to California to obtain high-grade marijuana on his behalf, to transport it to the Milwaukee area for distribution, to receive marijuana shipments in the mail, to mail drug payments to Heiniger in California, to distribute marijuana, and to store drugs and drug proceeds. According to records obtained from the State of Wisconsin's Department of Financial Institutions (DFI), Patterson is a listed organizer (with his father, J.P.) for Fast Eddy's LLC, which owns and operates the McDonald's restaurants located at 11250 N. Port Washington Road, Mequon, WI and 8739 N. Port Washington Road, Fox Point, WI. Edward Patterson is the sole organizer for Hotter Faster Eddy's LLC, which owns and operates the McDonald's restaurant located at 5344 N. Port Washington Road, Glendale, WI. In addition to directing his current and former employees to run drug errands, Patterson also used them to remove the daily deposits set to be taken to the bank from each restaurant's safe and to provide the deposits to him to finance his drug-trafficking activity. After utilizing the restaurants' daily deposits to promote his drug trafficking, he would then later return the proceeds of the drug trafficking to the McDonald's employees and ask that the money be deposited into the restaurant's business accounts, and be "back dated" so as to conceal that he had taken the money, used it to promote his drug trafficking, and then later returned it.

On September 6, 2012, Patterson was arrested while driving on Interstate 80 in Washoe County, Nevada with 32.66 pounds of marijuana. At the time of his arrest, Patterson informed Nevada Law Enforcement that he was the owner of a McDonald's restaurant and needed the money to "expand" his restaurant businesses. Patterson later told CS #4 that he used the proceeds from his marijuana trafficking to purchase the Glendale McDonald's.

On February 28, 2013, Patterson was arrested for possession with intent to distribute oxycodone. A search revealed $3,860 in cash in various denominations and numerous pill bottles containing methadone hydrochloride 10 mg (30 pills) and oxycodone hydrochloride 30 mg (59 pills).

According to CS#2, after Patterson was stopped and arrested in Reno, Nevada, Patterson said that he was going to start the "mail thing," sending marijuana packages to Milwaukee from California via the United States Postal Service. Patterson said this

2

method was more expensive, but safer. Patterson told CS #2 that by utilizing this method, Patterson would send multiple packages containing marijuana to multiple houses in the Milwaukee area. Patterson stated that the parcels could not exceed a certain weight limit, so he only put a few pounds of marijuana in each package. Patterson told CS #2 that Patterson was shipping anywhere from 30 to 60 pounds a month from California to Milwaukee, WI during the fall months of 2012.

CS #2 admitted receiving shipments of marijuana in the mail on behalf of Patterson. The first package arrived during the end of October or beginning of November of 2012. CS #2 recalled this shipment to contain 5 pounds of marijuana. CS #2 took 3 pounds out for CS #2 to sell, and was to give the other 2 pounds to Patterson. When the package arrived, CS #2 called Patterson, and Patterson told CS #2 to keep the marijuana, and to bring the money to Patterson once it was sold. CS #2 recalled selling all 5 pounds of marijuana for $4,100 per pound. CS #2 gave Patterson $3,300 per pound for the 3 pounds that were for CS #2 and $3,900 per pound for the other 2 pounds which were supposed to go to Patterson.

On November 30, 2012, under the direction and control of case agents, CS #2 did a recorded meet with Patterson. CS #2 asked for $2,500 that CS #2 had previously given Patterson for a marijuana debt. Patterson told CS #2 that he had given the $2,500 to the supplier (Heiniger), who wanted additional money to pay for the marijuana shipped to CS#2 that had been intercepted by law enforcement on November 20, 2012. During this conversation, CS #2 observed that there was an un-holstered black-colored pistol, which Patterson moved from the grill into the garage, to make clear that CS #2 saw it. Patterson also told CS #2 that the police were probably watching CS #2. Patterson said that he and the supplier (Heiniger) were having a hard time believing CS #2's story. Patterson told CS #2 that Patterson's arrest in Nevada was "different," and that "he" (Heiniger, the supplier) didn't believe CS #2's story because Wisconsin is pretty tough on marijuana laws. Patterson then asked CS #2 if CS #2 was working as "an informant." Case agents reviewed the recording and determined that it is consistent with CS#2's version of events. Breitzman also stated that Patterson typically concealed a semi-automatic pistol in his truck and that Patterson conducted numerous drug transactions from his truck.

Review of USPIS records between April of 2012 and September of 2013 reveal that approximately 35 packages, the majority of which had non-existent California return addresses, were sent to multiple addresses (belonging to Patterson's

3

coconspirators) in the Milwaukee metro area via U.S. Express mail. USPIS records reveal approximately 15 suspected money packages sent from the same addresses in the metro Milwaukee area to Paul Heiniger in California.

CS #3 stated he has known Edward Patterson since late 2012. CS #3 worked at all three of Edward Patterson's McDonald's locations, Fox Point, Mequon, and Glendale. When CS #3 met Patterson, CS #3 was working at Glendale McDonald's. Patterson asked CS #3 if CS #3 smoked marijuana, and CS #3 stated yes. Patterson asked if CS #3 could sell marijuana, which CS #3 stated yes. Patterson then began fronting one pound quantities of marijuana to CS #3. CS #3 recalled being charged $3,500 per pound. CS #3 would normally meet Patterson behind the Glendale McDonald's to obtain the marijuana. CS #3 has observed three to four other individuals picking up marijuana from Patterson during each time CS #3 obtained marijuana from Patterson. CS #3 also stated that Patterson sometimes spreads the marijuana around to various individuals to store for Patterson in addition to keeping marijuana at Patterson's residence at 1XX E. Belle Avenue, Whitefish Bay, WI.

CS #4 stated that Patterson said that he had numerous people who he would pay to receive the marijuana packages in the mail. Patterson told CS #4 that he would pay them approximately $600 to receive each marijuana package. Patterson would then have a girl named "Andrea" retrieve the packages and deliver the packages to him.

According to CS #4, the cash registers at the three McDonald's restaurants are emptied two or three times per day. The proceeds from those registers are compared to the "Cash Sheet" generated by the cash register. The "Cash Sheet" and proceeds are then used to prepare a "deposit bundle," consisting of the deposit slip and the items to be deposited, and those cash register proceeds are deposited into accounts at BMO Harris Bank several times per day. Bank records confirm the frequency of the cash deposits.

CS #4 further stated that s/he and bookkeeper R.H. are aware that Patterson instructs his individual restaurant managers to pull cash from the "deposit bundles" that are awaiting transport to the bank and to provide the cash to him. Patterson then later returns a sufficient amount of currency to replenish the "deposit bundles" and instructs the respective branch manager to re-construct the deposits, "back date" them, and deliver them to the bank. CS #4 stated that Patterson told CS #4 that he started selling marijuana last summer (2012) in order to earn money to purchase the

4

McDonald's located in Glendale, WI. CS #4 first became suspicious of Patterson's involvement in drug sales when he began to have managers at the McDonald's exchange smaller bills ($1, $5, $10, & $20 bills) for larger currency amounts ($50 & $100 bills) at local banks. The local banks became suspicious of this and started to deny the exchange requests. CS #4 stated that Patterson also began to take the nightly cash deposits from the three McDonald's for himself and never deposit them. CS #4 stated that employees began to comment that Patterson had run the McDonald's "dry" and that the stores had absolutely no cash on hand because Patterson took all of the deposits. Patterson would tell the managers that he would be at the store shortly and for them to have as much cash money as possible ready for him to pick up when he arrived. CS #4 stated initially Patterson would repay the money deposits before payroll so he could pay his employees, however, since January 2013 he has not repaid all of the money he has removed from the deposits. When CS #4 questioned Patterson about his involvement in selling marijuana, Patterson replied "how else do you think I could afford the Glendale McDonald's?" Multiple coconspirators have stated that Patterson uses the McDonald's cash deposit bundles to obtain marijuana, and then later deposits the same amount indicated on the deposit slip into the business bank accounts.

Both CS #4 and R.H. were suspicious of Patterson's activity taking the cash deposits from all of the restaurants and therefore, R.H. regularly updates CS #4 via email about which deposits are outstanding for each branch. CS #4 provided case agents with copies of the emails s/he received from R.H. between September 21, 2012, and September 11, 2013, which reflect that on numerous dates between September 21, 2012, and September 11, 2013, R.H. noted outstanding deposits for Patterson's McDonald's restaurants.

On October 26, 2012, a daily deposit in the amount of $4,823.92 from the Mequon McDonald's was prepared to be taken to the bank, however, Edward Patterson instructed the manager to provide that cash to him. The manager had prepared the deposit slip and deposit bundle and maintained those items at the restaurant and gave the cash to Patterson. On October 31, 2012, R.H. sent CS #4 an email documenting numerous daily deposits that were "not processed/not in the bank" from the various McDonald's restaurants, including the daily deposit of $4,823.92 from October 26, 2012 from the Mequon McDonald's, which was "missing." Sometime before January 3, 2013, Edward Patterson returned cash to the Mequon McDonald's manager and the manager took the cash, counted out $4,823.92 and re-bundled it in the deposit slip dated October 26, 2012, and deposited it on January 3, 2013. BMO Harris bank records reveal that on

5

January 3, 2013, a $4,823.92 cash deposit was made into the Fast Eddy's, LLC's BMO Harris Checking Account # XXXXXX9376. The date of October 26, 2012 was handwritten on the deposit slip; however, the deposit was actually made on January 3, 2013. CS #4 stated that the date the deposit was actually prepared was handwritten on the deposit slip and that deposit slip was maintained until Patterson returned the cash so that she and R.H. could keep track of the missing deposits and make sure that the amounts of the deposits matched when he returned the cash. CS #4 further stated that the delayed deposits were entered into the Fast Eddy's books as if they were deposited on the dates the slips were prepared to conceal that the money was being taken by Patterson to facilitate his drug trafficking and then returned to the McDonald's.

CS #4's emails, combined with subpoenaed BMO Harris Bank records reveal that between September 21, 2012, and September 11, 2013, R.H. noted 88 delayed deposits for the Fox Point McDonald's (for a total of $133,126.68), 126 delayed deposits for the Mequon McDonald's (for a total of $158,296.60), and 122 delayed deposits for the Glendale McDonald's (for a total of $$234,589.28). As of October of 2013, the following deposits remained outstanding: Fox Point was missing $1800.34 from September 6, 2013; Mequon was missing two deposits from September 10, 2013 in the amounts of $185.11 and $1000.90; Glendale McDonald's was missing one deposit from May 27, 2013 in the amount of $1061.76 and one deposit from June 5, 2013 in the amount of $4373.35.

If this case had proceeded to trial, a cooperating defendant would testify that he knew that Patterson withdrew $15,000 in cash from the McDonald's business account to purchase marijuana and that Patterson returned the money to the business the week before he was arrested, however, Patterson only returned $9,000 in cash to the manager of the Mequon McDonald's, not the entire $15,000. The cooperating defendant would also testify that Patterson told him that he was preparing for a deal in the fall of 2013 involving 250 pounds of marijuana for which he would pay $1200 per pound. Patterson also told this cooperating defendant that he had too much money and "wasn't able to do anything" with this large amount of money. Patterson asked the cooperating defendant for suggestions regarding what to do with all of his money and he suggested buying land and he also stated he had observed Patterson at his residence with approximately $30,000 to $40,000 in cash on multiple occasions.

CS #5 indicated that Patterson was one of his larger oxycodone customers. CS #5 first met Patterson in August of 2012 through "Farji." Case agents are aware that Farji recently died of an overdose of prescription pills. On two or three occasions, Patterson

6

purchased an entire prescription (or 450 pills) from CS #5 for $5,400. One of these transactions occurred at the McDonald's restaurant near Bayshore Mall. Case agents are aware that the McDonald's at 5344 N. Port Washington Road, Glendale, WI is next to Bayshore Mall. CS #5 admitted that s/he purchased personal use quantities of marijuana, ½ to 1 ounces of marijuana, from Patterson during the transactions. CS #5 stated that on 3 to 4 occasions Patterson sent his minor son to deliver marijuana to him. CS #5 also stated that after approximately 10 to 30 marijuana transactions with Patterson, during one transaction Patterson pulled out a smaller handgun from his pants pocket and showed the gun to CS #5. Patterson stated that he had a concealed carry permit and that he carries the firearm "in case anyone wanted to fuck with him."

Conservatively estimated, Patterson is responsible for the distribution of at least 100 kilograms but less than 400 kilograms of marijuana and at least 40 grams of oxycodone because this amount was reasonably foreseeable to him based on the co-conspirators' jointly undertaken criminal activity.

**Paul Heiniger** – Heiniger is one of the DTO's California sources of supply, who also brokers deals between Patterson and California-based marijuana grow operations. Based upon a review of precision location data for Heiniger's phone, at the time the indictment was returned, Heiniger was in Mendocino County, California, and believed to be living in a grow operation. According to confidential source information and text messages, Heiniger takes the coconspirators on Patterson's behalf to meet with marijuana growers, who provide them with multiple pounds of marijuana that all three then break down, package with wrapping to reduce odor, and ship in large buckets to various addresses in the metro Milwaukee area.

Heiniger told CS #1 that sometime during the month of September 2012 he would be flying to California to "work" clipping and trimming marijuana plants. CS #1 stated Heiniger had several "investors" (one of which is Patterson) who would "front" him money before he would travel to California. Heiniger and Lee stated they could make $800 to $1,000 per day in cash for trimming marijuana in California. According to CS#1, when Heiniger returned to Milwaukee, he would deliver the marijuana to his friends on "credit" and these friends sold the marijuana. CS #1 stated that Heiniger and Lee claim that they have made over $100,000 per month selling marijuana.

According to subpoenaed information, the American Express credit card issued to Edward Patterson, doing business as Fast Eddy's LLC, was used to purchase flights on US Airways tickets departing Milwaukee on August 13, 2012 for San Francisco,

7

California, for Edward M. Patterson, Paul Heiniger, I.P., Bernardo Espinosa Vanudios, Jr. (Bernardo Espinosa-Zamudio Jr.) and K.L. On numerous occasions, most recently May 2013, case agents have observed Heiniger meet with Patterson at Patterson's house.

On August 28, 2013, the Mendocino Major Crimes Task Force executed a search warrant at Heiniger's residence at 17XX Elm Lane, Willits, California. Only Heiniger's girlfriend, C.H., was present. Case agents recovered a U.S. Priority Mail postal parcel from "Dan Meyer 1XX N. Mill St., Saukville, WI 53808" to "Dug Debolt 17XX Elm Ln., Willits, CA 95490," which was opened and empty. Houtsinger identified R.D. as her roommate at the residence. The search also revealed approximately 2 pounds of marijuana, a garbage bag containing loose marijuana plant trimmings indicative of a marijuana grow, drug packaging materials, including 5 gallon buckets, a vacuum sealer and bags, bubble wrap, Styrofoam packing peanuts, and rolls of box tape.

Review of USPIS records reflects that on September 24 and October 22, 2012, and January 25 and 28, February 5 and 19, March 15 and 18, June 5 and 13, and July 2 and 12, 2013, Priority Mail parcels were sent from various addresses in the metro Milwaukee area to Paul Heiniger at 17XX Elm Lane, Willits, California. Because the packages were addressed to his real name and address, it is believed that they contained drug payments. Additionally, Heiniger was captured on video mailing packages to K.L. (who receives marijuana packages for Patterson) on February 6, February 19, March 20, April 15, and July 15, 2013. Heiniger admits that each of these packages contained marijuana shipments.

If this case had proceeded to trial, cooperating defendants would testify that they traveled to California on multiple occasions to purchase large quantities of marijuana on Patterson's behalf. Before each trip Patterson would provide the cooperating defendants with approximately $30,000 to $50,000 in cash for each trip, to purchase marijuana. Upon arrival in California, the cooperating defendants would contact Heiniger to facilitate the marijuana transactions and they would give Heiniger the money from Patterson to purchase the marijuana. On two occasions when a cooperating defendant traveled to California to purchase marijuana for the Patterson DTO, Heiniger and s/he traveled to the marijuana grow and the purchase of marijuana was made at the grow site. Afterwards, Heiniger and the cooperating defendant purchased packaging supplies for the marijuana, packaged the marijuana, and shipped the marijuana to specific addresses in Wisconsin, which were provided by Patterson.

8

Additionally, another cooperating defendant would testify that s/he started purchasing marijuana from Heiniger in the fall of 2012 and that Heiniger was Patterson's source of supply for marijuana. The cooperating defendant also traveled to California with Heiniger and Patterson to purchase marijuana, approximately 20 pounds on that occasion, and helped Heiniger package marijuana to be shipped back to Wisconsin. The cooperating defendant would also testify that Heiniger stated that he had made over $100,000 by selling marijuana and was saving his money so that he could purchase his own marijuana grow.

Conservatively estimated, Heiniger is responsible for the distribution of at least 100 kilograms of marijuana, because this amount was reasonably foreseeable to him based on the co-conspirators' jointly undertaken criminal activity.

**Kevin Breitzman** – Breitzman is Patterson's brother in law and former manager of the Glendale McDonald's. Breitzman went to California on three occasions to meet with Heiniger to obtain marijuana, which he shipped to Milwaukee. A cooperating defendant stated that Breitzman delivered marijuana to him/her on approximately 4 -5 occasions and that s/he gave money for prior marijuana purchases to Breitzman for payment to Patterson on approximately 1-2 occasions.

On February 4, 2013, Breitzman was arrested in Sonoma County, California. A search of the vehicle revealed 2 empty boxes for commercial grade vacuum sealer bags, used latex gloves, a packing tape gun with tape, receipts, airline flight itinerary and boarding passes, rental car summary, miscellaneous papers, including a receipt from Home Depot showing the purchase of nine (9) buckets, a cellular telephone, and seven (7) cardboard boxes. Each of the cardboard boxes was determined to contain one (1) 5 gallon orange Home Depot Paint Bucket. Inside of each bucket were sealed packages of marijuana inside vacuum sealed bags, for a total of approximately 22.2 pounds. Located in Breitzman's vehicle was a typed letter on McDonald's letterhead stating "To Whom It May Concern: I am authorizing my employee, Kevin Breitzman to use my Business Gold American Express between the dates of 2-2-13 thru 2-5-13. He will be traveling to California on business, may use the card for car, hotel, gas, food and incidentals. If you have any questions, feel free to ask. 414-659-7771, Thanks, Edward Patterson." The letter had a signature below the name, and is believed to be signed by Edward Patterson.

9

At the time of Breitzman's arrest, case agents recovered a "Customer Copy" of an Express Mail package, for Label #EI719082615US. The sender information was "T. Vargas, 1599 N. Bush St, Ukiah, CA 95482." The package was sent to "Tammy Webler 6XXX S. 17th Street, Milwaukee, WI 53221." A federal search warrant was obtained for this parcel, which was found to contain approximately 1,531 grams of high-grade marijuana.

A search of cellular telephone number 414-232-0083, which was seized from Kevin Breitzman at the time of his arrest on February 4, 2013, revealed that he was in contact with Patterson about his meeting with Heiniger and addresses where he should send the marijuana to on behalf of Edward Patterson. For example, he texted Patterson "Just landed." Patterson texted back "Ok thanks bud I freaked out for a min went online tho, check in with P" (Paul Heiniger) and "262-278-XXXX" (Heiniger's number). Patterson texted, "No detours buddy, be as careful as past or more, only diff is its all my money vs 5 people's, all I got," and "Hey have a nice dinner tomorrow night on me take Paul go get like steaks at a high end joint, get fat and relax." On February 3, 2013, Breitzman texted Paul "U up yet. Wanna try purple nurple" (strain of high-grade marijuana).

A couple of days after Breitzman's arrest in February of 2013, CS #4 received a text message from Patterson advising that Breitzman was arrested in California and Patterson needed approximately $3,000 from the cash deposits of the McDonald's to wire to Breitzman for bond.

CS #2 identified other members of Patterson's marijuana trafficking organization, one of which CS #2 identified as "Kevin." CS #2 stated that while Patterson was in Seattle during the fall of 2012, Patterson told CS #2 to obtain marijuana from "Kevin." CS #2 provided case agents with a cellular telephone for "Kevin" of 414-232-XXXX. "Kevin" was the manager of the McDonald's restaurant located in Mequon, WI, which Patterson owns. CS #2 stated that "Kevin" is involved in marijuana trafficking with Patterson, and that CS #2 had purchased marijuana from "Kevin" at Patterson's direction.

According to subpoenaed information, the American Express credit card issued to Edward Patterson, doing business as Fast Eddy's LLC, was used to purchase a round-trip airline ticket for Kevin Breitzman to depart Milwaukee, WI for San Francisco, CA on June 30, 2013, at a cost of $875.60. According to subpoenaed

10

information, Breitzman rents a storage unit at 43XX N. Richards Street, Unit #E38, Milwaukee, WI. Patterson's GPS data shows that he frequently traveled to this storage unit and Patterson also obtained his own storage unit in the same facility.

Conservatively estimated, Breitzman is responsible for the distribution of at least 100 kilograms of marijuana, because this amount was reasonably foreseeable to him based on the co-conspirators' jointly undertaken criminal activity.

**Andrea Marquardt** - Marquardt is a former McDonald's employee, was Patterson's most frequently called number, and runs drug errands on Patterson's behalf. Multiple cooperating defendants stated that Marquardt coordinates with Patterson to pick up marijuana shipments from the various addresses that receive packages from California, is a drug runner, picks up drug proceeds and drug payments on behalf of Patterson, and also received marijuana shipments at her various addresses.

On February 14, 2013, acting under the direction and control of case agents, CS #2 did a recorded meet with Patterson's at his house. CS #2 said that s/he had a customer who wanted to purchase marijuana. Patterson agreed to meeting CS #2's customer to conduct marijuana transactions, and stated that "Andrea" (Marquardt) would deal with CS #2's customer instead of Patterson.

Patterson told CS #3 that Patterson had "lost a package", and Patterson had sent one of his girls to go get the package. CS #3 asked Patterson if Patterson was nervous about sending her to get it, and Patterson said he wasn't because the girl was blond, blue-eyed, pretty, and skinny so nobody would suspect that she was doing something illegal. (This physical description matches that of Andrea Marquardt).

On November 7 and 13, 2012, February 4, July 2, 8, and 15, 2013, Priority Mail parcels were sent from fake addresses in Mendocino County CA to N16 W26XXXX Bluegrass Lane, Pewaukee, WI 53072. On November 14, 2012, and July 2 and 15, 2013, Priority Mail parcels were sent from fake addresses in Mendocino County, CA to 16XX A Coachlight Dr., New Berlin, WI. The packages weighed between 8 and 12 pounds and contained marijuana. When Breitzman was arrested on February 4, 2013, case agents observed an additional receipt which showed a Priority Mail package sent from the Tamlmadge CA Post Office to "Andrea Marquardt at N16W26XXXX Bluegrass Lane, Pewaukee, WI 53072," with a shipment price of $44.60, which was paid for in cash. This package weighed 7 lbs., 2 ounces, and showed Label #9505510666193035433800, with an expected delivery date of February 7, 2013.

Marquardt now admits that this parcel contained marijuana. If this case had proceeded to trial, cooperating co-defendants would testify that Marquardt received marijuana packages in the mail for Patterson and Marquardt also picked up marijuana packages and delivered them to Patterson.

Conservatively estimated, Marquardt is responsible for the distribution of at least 100 kilograms of marijuana, because this amount was reasonably foreseeable to her based on the co-conspirators' jointly undertaken criminal activity.

**Paul Markiewicz** - Markiewicz is employed as a janitor at McDonald's. According to statements he made to CS#4, he has traveled to California at least twice to meet with Heiniger and obtain marijuana on behalf of Patterson, which he then shipped back to various addresses in the metro Milwaukee area.

On July 1, 2013, Patterson stated via text that he sent Paul Markiewicz and Kevin Breitzman to California for Breitzman's court date. Patterson stated that he sent Markiewicz with because he couldn't trust Breitzman with a credit card. Markiewicz admitted to CS#4 that Patterson sent him to California go marijuana shopping, and that this was his third trip to California for Patterson. According to CS#4, Patterson sometimes sent Markiewicz to pick up cash deposits from the three McDonald's restaurants.

On August 6, 2013, case agents executed a search warrant at Markiewicz's residence, W124 N13XXXX Wasaukee Road, Germantown, WI, which revealed a white 5 gallon sized bucket with a sealed top. The bucket contained marijuana packaged in a vacuum seal bag. The bucket and vacuum seal bags were consistent with the method of packaging and transport of marijuana observed at Patterson's residence and discovered from Breitzman's traffic stop and arrest in California. Also discovered in a bedroom believed to be occupied by Markiewicz was a total of $11,020 in U.S. paper currency concealed inside shoes in a shoe box. The currency was in denominations of $100's, $50's, and $20's which is consistent with denominations used in the transactions of controlled substances. Approximately 96.6 grams of marijuana was discovered inside the residence.

A search of s silver Toyota 4-Runner owned by Markiewicz revealed six (6) large black duffle bags. The large black duffle bags were consistent with duffle bags observed at Patterson's residence during suspected drug transactions. Also recovered

12

from the search of Markiewicz's residence was a letter, typed on McDonald's letterhead, stating "To Whom it May Concern: Paul Markiewicz is authorized to use the American Express Business card. He is traveling to California on business to look at equipment. He is authorized to use it from June 30th until July 4th. If you have any questions please contact Edward Patterson, the owner, at 414-659-XXXX. Thanks, Edward Patterson." A subsequent search of Markiewicz's telephone showed that Markiewicz had Paul Heiniger's cellular telephone numbers stored in his telephone under the name "Skull Calumet."

Fast Eddy's American Express records reveal a purchase for a one-way airline ticket for Paul Markiewicz to depart Milwaukee, WI for San Francisco, CA on June 30, 2013, at a cost of $442.80. Additionally, a suspected money package was sent via Express Mail from Paul Markiewicz 11XXX N. Port Washington Rd. Mequon, WI 53092 (Mequon McDonald's address) to Paul Heiniger 14XXX W. Park Ave. Boulder Creek, CA 95006. The package weighed 2 lbs. and was delivered on July 3, 2013 and Markiewicz admits that this package contained a drug payment. Finally, on numerous occasions, case agents have observed Markiewicz at Patterson's residence and the three McDonald's restaurants engaging in drug transactions.

Conservatively estimated, Markiewicz is responsible for the distribution of at least 50 kilograms of marijuana because this amount was reasonably foreseeable to him based on the co-conspirators' jointly undertaken criminal activity.

**John Webler** - John Webler used to work at a McDonald's owned by the Pattersons and is Patterson's 14th most frequently called phone number. Webler introduced CS#2 to Patterson for the purpose of obtaining marijuana. Webler receives marijuana packages for Patterson.

CS #2 stated that he met Patterson through John Webler, who works as the Manager at a McDonald's in Sussex, WI. When CS #2 told Webler that s/he wanted to purchase a quarter-pound quantity of marijuana, Webler told CS #2 to call Edward Patterson. CS#2 met Patterson at his residence and showed him approximately four ounces of marijuana. CS #2 asked Patterson what he did for a living, and Patterson informed CS #2 that Patterson owned "a couple" McDonald's Restaurants, and agreed to sell CS #2 additional quantities of marijuana on a regular basis. CS #2 estimated purchasing approximately 15 pounds of marijuana during July of 2012. Some of this marijuana was fronted, and some paid for in cash. By mid-August of 2012, CS #2 was

obtaining one pound quantities of marijuana from Patterson for $4,200 per pound. CS #2 was obtaining a pound every one to two days. CS #2 estimated obtaining between 15 and 20 pounds during the month of August of 2012. By August of 2012, CS #2 was using Patterson exclusively as a supplier.

During the search of Breitzman's vehicle in California on February 4, 2013, case agents recovered a "Customer Copy" of an Express Mail package, for Label #EI719082615US. The sender information was "T. Vargas, 1599 N. Bush St, Ukiah, CA 95482." The package weighed 7 lbs and was addressed to "T.W. (Webler's wife) 67XX S. 17th Street, Milwaukee, WI 53221." The package was intercepted and a federal search warrant was obtained for this parcel, which was found to contain approximately 1,531 grams of high-grade marijuana. Review of Breitzman's text messages reveals that on February 2, 2013, Patterson texted Breitzman "3 min away I'll pick u up in back" and "Webler isn't on that sheet, so sometime tomorrow call me I'll get u his info, also Dallas got evicted so can't use him" This text message was sent to Breitzman while he was in California obtaining, packaging and shipping the marijuana.

On November 7 and 13, 2012, and February 4, July 2, and July 16, 2013, Priority Mail Parcels were sent from fake addresses in California to the Weblers at 67XX S. 17th Street, Milwaukee, WI 53221. The weight of the packages range between 5 pounds and 12 pounds and are consistent with the weight of the packages that were obtained and found to contain marijuana. The majority of the packages were addressed to "T.W." one was addressed to "T.P." and one was addressed to "John Webler." T.W. signed for at least one of these suspected marijuana packages.

Conservatively estimated, Webler is responsible for the possession with intent to distribute at least 10 kilograms of marijuana.

**Bruce Hutson** - Hutson is Patterson's business manager for his McDonald's restaurants and he also stores marijuana and distributes marijuana on Patterson's behalf. According to CS #4, Hutson was hired to replace the McDonald's managers who know too much about Patterson's criminal activity. While CS#4 and Hutson were together, s/he heard Hutson talking to Patterson about how much marijuana he had. Hutson explained to Patterson that he had customers and wanted to sell the marijuana that was in open jars first. Pursuant to a court-authorized GPS installed on Patterson's truck, case agents are aware that Patterson frequently travels to Hutson's house before and after going to the post office to ship drug payments to California and before and

14

after going to a storage unit, where he stored drugs and drug proceeds. Hutson is also Patterson's 24th most frequently called number.

On October 16, 2013, case agents executed a federal search warrant at Hutson's house on Oakland Avenue in Whitefish Bay. During the search warrant, case agents recovered 3 ¼ pound bags of marijuana, 1 large mason jar containing marijuana, 1 small mason jar containing marijuana, plastic bags, other empty mason jars, 10 5-gallon pails, a digital scale, money counting machine, and a black duffle bag. The jars are consistent with those recovered at Bernardo Espinosa-Zamudio's house and the bag is consistent with those used by Patterson and Markiewicz.

Conservatively estimated, Hutson is responsible for the possession and distribution of at least 10 kilograms of marijuana.

**Bernardo Espinosa-Zamudio** – Bernardo Espinosa-Zamudio is one of Patterson's customers and an investor in Patterson's DTO. Numerous confidential sources all stated that they delivered marijuana to Espinosa-Zamudio on Patterson's behalf and also picked up drug payments to deliver to Patterson from Espinosa-Zamudio. According to, Espinosa-Zamudio distributed large quantities of marijuana on behalf of Edward Patterson. Additionally, Bernardo Espinosa-Zamudio traveled out to California to obtain marijuana with Patterson and Heiniger on August 13, 2012. Review of USPIS records reveal that a money package was shipped from X. Morales-Zamudio & Bernardo Espinoza-Zamudio's residence at 25XX N. Holton Street, Milwaukee, WI, on September 24, 2012. The package was mailed from X. Morales 25XXA N. Holton St. Milwaukee, WI 53212 to Paul Heiniger 17XX Elm Ln. Willits, CA 95490. The package weighed 2 lbs. 11 oz. and was delivered on September 25, 2012. The package was signed for by Paul Heiniger.

Pursuant to a court-authorized GPS on Patterson's truck, case agents are aware that Patterson frequently travels to Espinosa-Zamudio's residence before and after going to the post office and before and after going to a storage unit. For example, on September 28, 2013, the location of Patterson's vehicle was monitored via GPS, which reflected that at approximately 12:24 pm Patterson went to 25XX N. Holton St., Milwaukee. Video surveillance of Patterson's residence 110 E. Belle Avenue, Whitefish Bay, WI, revealed that immediately prior to his arrival at 25XX N. Holton St., Milwaukee, Patterson placed a white garbage bag which appeared to contain an item and a white 5 gallon bucket in the rear cab of his truck. When Patterson returned home

15

after visiting 25XX N. Holton St., Milwaukee, he removed the five (5) gallon bucket and placed it in his garage. Patterson also removed what appeared to be either a black garbage bag or backpack from his vehicle and brought it inside his residence. Based on their training and experience, and the investigation to date, case agents believe that Patterson delivered a quantity of marijuana to Bernardo Espinoza-Zamudio at 25XX N. Holton St., Milwaukee on this date.

On October 16, 2013, case agents executed the federal search warrant at Bernardo Espinoza-Zamudio's residence at 25XX N. Holton St., Milwaukee. Bernardo Espinoza-Zamudio was the only person present during the execution of the search warrant. Case agents recovered a Ziploc bag containing approximately 42 grams of marijuana from the living room and two jars containing a total of approximately 1179.3 grams of marijuana were recovered from the kitchen cabinet. Additionally, over one hundred rounds of ammunition were recovered from the kitchen counter.

In the bedroom dresser, case agents recovered a Ziploc bag containing approximately 212.2 grams of marijuana or marijuana hash. Two handguns, a Sig Sauer P238, .380 automatic handgun bearing serial number 27A117450, with 5 rounds in one magazine, and a FNH USA Five-Seven, 5.7 28 caliber handgun bearing serial number 386246137, were recovered from the top shelf of the bedroom closet. Additionally, more than $1,000 in U.S. currency was recovered from a large bedroom dresser. After being advised of his rights, Bernardo Espinoza-Zamudio told case agents that he only had the "guns, money, and drugs" during the execution of the search warrant. He also admitted to smoking marijuana earlier that morning.

Conservatively estimated, Espinosa-Zamudio is responsible for the distribution of at least 80 kilograms of marijuana because this amount was reasonably foreseeable to him based on the co-conspirators' jointly undertaken criminal activity.